MARGARO NAVARRO, demandante y apelante, *v.* COMPAÑÍA AZUCARERA "EL EJEMPLO", demandada y apelada.

Núm. 7465.—*Sometido:* Junio 21, 1938. *Resuelto:* Julio 28, 1938.

*Burset & Pérez Pimentel,* abogados del apelante; *González Fagundo & González, Jr.,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

La demanda de este caso alega en síntesis que la demandada apelada es dueña de una vía férrea que en el sitio denominado "La Bejuca" cruza la carretera insular que conduce de la ciudad de Humacao al poblado Punta Santiago. Que

el 29 de abril de 1931 la demandada usaba dicho paso a nivel para pasar sus trenes que transportaban cañas de azúcar a su factoría. Que la demandada tiene un guarda-barrera para atender a la colocación de dos cables de acero que sujetos por sus extremos a dos postes fijados en los lados de la carretera impiden el tránsito del público mientras los trenes discurren por el paso a nivel. Que en la fecha indicada el demandante se hallaba parado a un lado de la carretera, muy cerca del paso a nivel, y que el empleado de la demandada encargado del paso a nivel, descuidada y negligentemente, dejó tendidos sobre la carretera los cables de acero en forma de espiral, sujetos por uno de sus extremos a uno de los postes mencionados. Que entre tres y cuatro de la tarde, al pasar una guagua por encima de dichos cables, uno de ellos fué puesto momentáneamente en tensión, lanzándose violentamente sobre el demandante, produciéndole un golpe que le fracturó la pierna derecha, le causó grandes dolores físicos y lo ha dejado permanentemente inútil de dicha extremidad. Estimó el demandante en $10,000 los daños así sufridos y solicitó sentencia por esa cantidad, más las costas, desembolsos y honorarios de abogado.

Negó la demandada por falta de información y creencia que hubiese existido el alegado accidente y negó también la existencia de los daños reclamados, pero aceptó las demás alegaciones de la demanda, exponiendo además como defensa especial que la demanda no aduce hechos constitutivos de causa de acción.

Tres años después de la fecha del accidente, allá por el 23 de marzo de 1934, se celebró el juicio oral, y el 10 de diciembre del año siguiente se dictó la sentencia que deses-timó la demanda por los fundamentos de una opinión en que luego de hacer una síntesis de la demanda y de exponer que la demandada la contestó negando sus alegaciones fundamentales, termina así:

"El día señalado para el juicio se practicó prueba testifical de ambas partes y además una inspección ocular.

"Por la prueba testifical de ambas partes, el conflicto de la cual ha sido resuelto teniendo en cuenta todas las modalidades de los distintos testimonios tal como los mismos se produjeron durante el curso del juicio, y por el resultado de la inspección ocular realizada, la corte entiende que los hechos esenciales de la demanda no han quedado probados, por lo que opina que la misma debe ser declarada sin lugar, sin costas."

Contra esta sentencia interpuso el demandante el presente recurso de apelación imputando a la corte inferior tres errores, a saber:

"*Primero:* La corte de distrito de Humacao cometió error al declarar que los hechos esenciales de la demanda no han sido probados.

"*Segundo:* La Corte de Distrito de Humacao cometió error manifiesto al apreciar la prueba.

"*Tercero:* La sentencia dictada por la Corte de Distrito de Humacao es contraria a la prueba y a derecho."

Los tres errores señalados por el apelante se reducen a uno, que puede sintetizarse así: La corte cometió error manifiesto en la apreciación de la prueba.

Declararon por parte del demandante los testigos José María Pérez, chófer que conducía la guagua, los pasajeros Carmelo Rodríguez y Jesús Sánchez, el demandante, el Dr. Enrique Matta y el guardabarrera Francisco Delgado. Los tres primeros corroboran en todas sus partes la declaración del demandante Margaro Navarro. Vieron a Navarro al lado de la carretera en aquel sitio inmediatamente antes del accidente, vieron los cables extendidos en el suelo a través de la carretera, se dieron cuenta cuando uno de éstos se enredó debajo de la guagua y todos oyeron los gritos de Navarro, lo vieron sobre el pavimento de la carretera sangrando profusamente por la pierna derecha sin poder afirmarse sobre la misma y lo condujeron a la guagua, llevándolo a una clínica de Humacao donde fué asistido por el Dr. Enrique Matta.

El Dr. Enrique Matta declaró que en la fecha indicada le llevaron al demandante a la clínica con una fuerte lesión

en la pierna derecha; que tenía fracturada la tibia; que no le amputó la pierna pero que fueron tantas las astillas de hueso que tuvo que extraerle, que había quedado permanentemente inútil de aquella pierna, sobre la cual no podría afirmarse más.

El guardabarrera, que para el ciclón de San Ciriaco ocurrido el 8 de agosto de 1899 tenía ya 46 años de edad y que por consiguiente el día del juicio contaba 85 años, entre otras cosas declaró:

"P. ¿Sabe de algún accidente que pasó por allí en La Bejuca el 29 de abril de 1931?

R. Yo lo único que me acuerdo.......

P. ¿Ud. lo sabe si pasó algo por allí ese día?

R. No me acuerdo bien.

P. ¿Ud. no sabe de ese accidente que ocurrió el 29 de abril de 1931 en La Bejuca, estando Ud. allí de guardavías?

R. Puede haber pasado, pero no me acuerdo bien.

P. El día ese, ¿vió a Margaro Navarro?

R. Sí, señor.

P. ¿Dónde estaba?

R. Él venía de la Playa de trabajar.

P. ¿Y cómo si lo vió allí no se recuerda de nada?

R. Él era conocido mío.

HON. JUEZ: ¿Era qué?

R. Era conocido mío.

LCDO. PÉREZ PIMENTEL: Sr. Juez, nosotros hemos traído el testigo que en esa fecha era empleado de la Central Ejemplo para saber en qué consistía su empleo; eso es todo.

LCDO. GONZÁLEZ FAGUNDO: También el testigo debe declarar si Margaro Navarro estaba ahí y si pasó algo.

LCDO. PÉREZ PIMENTEL: El testigo dijo que Navarro estaba allí y en lo que concierne al accidente, el testigo ha dicho que pudo haber pasado algo, pero que no se recuerda. Además, nosotros no queremos que el testigo nos diga qué pasó allí.

HON. JUEZ: El testigo dijo que ocurriría algo allí, pero que no lo recuerda bien.

LCDO. PÉREZ PIMENTEL: (Al testigo.)

¿Ese día Margaro Navarro estuvo conversando con Ud?

R. Sí, señor.

P. ¿Se paró a conversar con Ud.?

R. Sí, señor.

P. ¿En qué parte de la carretera? ¿Al lado derecho viniendo de la Playa?

R. Sí, señor.

P. ¿En qué sitio estaba Ud. parado?

R. En el borde de la cuneta.

P. ¿Ud. sabe si allí hay unos cables?

R. Sí, señor.

P. ¿En qué forma se sujetan?

R. Al lado allá hay un poste y al lado acá hay otro.

P. ¿Los cables estaban amarrados del poste que estaba del lado suyo?

R. Me parece que sí, no recuerdo bien.

P. ¿Cómo estaban los cables puestos?

R. Como yo los acostumbraba poner.

P. ¿Y por allí pasó una guagua?

R. Sí, señor.

P. ¿Qué pasó al pasar la guagua?

R. Venía para acá una guagua e iba para allá un carro. El carro pasó y la guagua se arrimó al poste y pasó y cuando brincó el cable yo me tiré a la cuneta a cogerlo.

P. ¿Se recuerda si el cable le hizo algo a este hombre?

R. .No lo sé.

P. ¿Sabe cuál cable fué el que la guagua tiró a la zanja?

R. No lo sé.'' (T. de E., págs. 44 y 45.)

Como podrá verse de la declaración antes transcrita el mismo guardabarrera, a pesar de la debilidad de su memoria, asegura que al pasar la guagua por encima de los cables saltó uno de ellos y tuvo él que tirarse a la cuneta a recogerlo.

Hemos leído cuidadosamente la transcripción de evidencia y no encontramos nada en las declaraciones de los testigos del demandante que pueda hacer dudar de su veracidad. Sus contestaciones son categóricas, no hay evasivas ni contradicciones, y si bien existen ciertas discrepancias entre ellos en cuanto a la hora exacta en que ocurrió el accidente, el ancho de la carretera, la distancia a que se hallaba Navarro del paso a nivel, etc., etc., tales discrepancias, lejos de debilitar la fuerza probatoria de sus testimonios, los fortalecen,

pues demuestran que la prueba del demandante no había sido amañada.

Es muy conocido de todo estudiante de Evidencia el clásico experimento del grupo de personas que presencia un accidente y que luego, al relatarlo, no hay dos de los observadores que estén estrictamente de acuerdo en todos sus detalles. Además, es de conocimiento general la inexacta noción que del tiempo y del espacio corrientemente tienen los testigos ignorantes, no debiendo tampoco perderse de vista la circunstancia de que en este caso los testigos declararon tres años después de haber ocurrido el accidente.

A nuestro juicio la evidencia del demandante sostiene prima facie las alegaciones esenciales de su demanda. ¿La controvirtió la demandada? Veámoslo. Declararon por la demandada los testigos Mario Fuentes, Antonio Quintero, Francisco Rivera y Miguel A. Burset.

*Declaración de Mario Fuentes:* Declaró que es ingeniero civil y que ha sido durante quince o diez y seis años empleado de la Central Ejemplo; que trabajaba en mensura, planos de puentes, etc.; que en un sitio denominado "La Bejuca" había un cruce de la Central Ejemplo en la carretera que conduce de Humacao a la playa; que él hizo el estudio para dicho cruce y la construcción se hizo bajo su supervisión; que unos días antes de la vista del caso hizo un plano de dicho cruce; que al este del cruce, de soporte a soporte, tiene 6 metros 73 centímetros de ancho la carretera; que en el lado oeste tiene 7 metros 25 centímetros de ancho; que el ancho embreado de la carretera en la parte este es de 4 metros 20 centímetros y en la parte oeste 4 metros con 20 centímetros; que del embreado a los soportes en la parte este hacia la izquierda tiene 1 metro 23 centímetros y del soporte al borde de la cuneta tiene 50 centímetros; que del soporte del este hacia la izquierda tiene un metro con 30 centímetros del embreado al soporte y del soporte al borde de la cuneta tiene 60 centímetros; en el lado oeste hacia la izquierda tiene 1 metro 50 centímetros del borde de la brea

al soporte y del soporte al borde de la cuneta tiene 50 centímetros; en el oeste, al lado derecho, desde la brea al soporte, hay 1 metro 55 centímetros y del soporte hasta el borde de la cuneta hay 60 centímetros; que las dimensiones son las mismas que cuando se plantaron los soportes; que no se ha alterado el curso de la vía férrea; que del soporte que está en el este al lado derecho viniendo de la playa al soporte del este que está al lado izquierdo hay 6 metros 73 centímetros; que del soporte que está en el este en el lado derecho viniendo de la playa al que está en el oeste al lado derecho hay 9 metros con 66 centímetros; que del soporte que está al este al lado izquierdo viniendo de la playa al que está en el oeste al lado izquierdo hay 8 metros con 60 centímetros. (Se ofreció el plano en evidencia.)

En repregunta dijo el testigo: Que el paso a nivel fué hecho en el año 1916; que las distancias entre los soportes no se han variado.

*Declaración de Antonio Quintero:* Declaró que es empleado de los Ferrocarriles del Este; que conoce el cruce ''La Bejuca'' hace como quince años; que dicho cruce estaba igual en 1931 que hoy y también que cuando se hizo; que no se ha cambiado en nada; que el trazado de la carretera no se ha cambiado.

En repregunta dijo que estaba presente cuando se pusieron los soportes; que él los colocó; que como hace tanto tiempo se le ha olvidado la distancia entre uno y otro.

*Declaración de Francisco Rivera:* Declaró que trabaja en la Central ''El Ejemplo'' hace catorce años; que conoce a Antonio Quintero, quien era empleado allí desde antes que él; que era jefe de tráfico y supervisor de vías; que las obligaciones del supervisor de vías es dirigir el tráfico de los trenes, reparar las vías y conservarlas en buen estado, cambiar las traviesas podridas por nuevas y dirigir, en general, el movimiento de trenes; que dichas vías, de las que él es supervisor, siempre se han mantenido en perfecto estado.

*Declaración del Lic. Miguel A. Burset:* Que en el año 1931 era Juez Municipal de Humacao, hasta el mes de agosto o principios de septiembre; que tomó las declaraciones e investigó el accidente que le ocurrió a Margaro Navarro; que después de tomadas las declaraciones hizo una inspección ocular.

Veamos ahora si la inspección ocular pudo en manera alguna controvertir la prueba del demandante. El acta de la inspección ocular dice así:

"El día 10 de agosto de 1935 se celebró la inspección ocular en este caso, compareciendo el demandante por medio de su abogado Sr. Miguel A. Burset, y la demandada por el suyo, Sr. Francisco González Fagundo.

"Se trasladó la Corte al sitio de autos. En el poste cerca al cual se declaró que estaba parado el demandante hay un cable que se extiende para hacer las veces de barrera para la protección del público, cuando viene discurriendo por la vía alguna locomotora. El cable, con los dobleces a que se le somete el servicio para el cual ha sido colocado en dicho sitio, se deja caer a tierra a lo ancho de la carretera. Dos automóviles le han pasado por encima en distintos sitios del ancho de la carretera, y no ha habido ninguna clase de movimiento del cable hacia arriba o hacia los lados. El cable, antes de llegar a tierra, desde el sitio en que está atado al poste, describe una línea oblicua, como estableciendo uno de los lados de un triángulo de noventa grados cuyo vértice sur está aproximadamente a cuatro pies del poste, precisamente donde termina el pavimento de la carretera y comienza el paseo o margen septentrional de la misma."

Razonando el abogado del demandante apelante sobre el valor probatorio de la inspección ocular en este caso celebrada, se expresa así en su alegato, lo que transcribimos por estimar correctos sus razonamientos y sus atinadas observaciones sobre la cuestión:

"Al practicarse la inspección ocular se hizo pasar dos automóviles por encima de los cables y ninguno de éstos se movió hacia arriba o hacia los lados. (Transcript pág. 12.) Tal vez la Corte entendió que esta circunstancia rebatía la prueba del demandante. Si así lo hizo, cometió un grave error. El hecho de que otros auto-

móviles hayan pasado por encima de los cables sin que éstos se hayan movido, no establece la improbabilidad de que el accidente ocurriera en la forma que lo relata el demandante y sus testigos. Recordemos que el día del accidente había dos cables tendidos sobre la carretera, que la guagua le pasó por encima a ambos cables y sin embargo fué uno solo de ellos el que se enredó y saltó hacia el lado produciéndole el golpe al demandante. Nosotros no comprendemos cómo el Juez de la Corte inferior podía esperar que el cable volviera a saltar al pasar por encima de ellos dos automóviles. Ni siquiera se utilizó la misma guagua que guiaba José María Pérez el día del accidente, o una similar a ella. Para obtenerse el mismo resultado la Corte tenía que reproducir infinidad de circunstancias a fin de que las condiciones que existieron cuando ocurrió el accidente fueran similares a las del día del experimento. Pero no se hizo así, sino que por el contrario se ordenó que los cables se cruzaran en la carretera y que dos automóviles de turismo les pasaran por encima. Las condiciones no eran similares y el resultado no podía ser el mismo. La posición exacta de los cables, sitio sobre el cual pasaron las ruedas de la guagua, posición de los ganchos de hierro que estaban asidos a los extremos sueltos de los cables, el peso de la guagua, estructura externa de los neumáticos de la misma, configuración de la guagua por su parte inferior, estado de la carretera, y cien condiciones más hubiera tenido la Corte que reproducir para que el cable saltara como lo hizo el día del accidente. Pero nada de eso se hizo y si la Corte en estas condiciones dió tanto valor a su experimento, es indiscutible que cometió un grave error.''

Es evidente que la inspección ocular en la forma en que se hizo ninguna luz pudo arrojar sobre el caso, y por supuesto no controvirtió en manera alguna la prueba del demandante.

En el caso de *Rogelia Caballero* v. *Eduardo González,* ante, pág. 539, refiriéndonos al valor probatorio que debe darse a testimonios no controvertidos cuando no hay conflicto en la prueba, citamos con aprobación las palabras del Juez Field en el caso de *Quock Ting* v. *U. S.,* 140 U. S. 417, 35 L. Ed. 501. Dicha cita dice así:

''Indudablemente, como regla general el testimonio positivo no controvertido sobre un hecho determinado debe controlar la decisión de la corte; esta regla, sin embargo, admite muchas excepciones.

Puede existir tal improbabilidad en las aseveraciones de un testigo que induzca a la corte o al jurado a descartar su evidencia, aunque no haya testimonio alguno en contrario. El testigo puede contradecirse tan eficazmente por sus propias manifestaciones como si se presentara prueba en contrario; las muchas omisiones en su relato de determinadas transacciones y aún su propia conducta, pueden ser suficientes para desacreditar toda su declaración. Su manera de declarar también puede dar lugar a dudas sobre su sinceridad y dar la impresión de que está imprimiendo un colorido falso a hechos esenciales. Todas estas circunstancias pueden ser consideradas al determinar el peso probatorio que debe darse a su declaración, a pesar de que no se haya presentado testimonio alguno que lo contradiga.''

Ya hemos dicho que no existe conflicto de prueba, pues la de la demandada en manera alguna tiende a controvertir la del demandante; que las declaraciones de los testigos del demandante son categóricas, libres de evasivas y contradicciones, y que aunque pueden observarse en ellas ciertas discrepancias en detalles sin importancia, especialmente con respecto a distancias y tiempo, tales discrepancias militan más bien a favor del demandante. Tampoco es físicamente imposible ni inverosímil la teoría que exponen el demandante y sus testigos. En su opinión el juez de la corte inferior no aduce razón alguna que justifique descartar la prueba del demandante. Habla de un conflicto de prueba que en realidad no existe y termina exponiendo que teniendo en cuenta las modalidades de los distintos testimonios y por el resultado de la inspección ocular, que ya conocemos, concluye que el demandante no ha probado los hechos esenciales de su demanda.

A nuestro juicio, el juez de la corte inferior carecía de base legal suficiente para descartar la prueba del demandante. Debió darle crédito y al no hacerlo así, cometió error manifiesto en la apreciación de la misma.

Como la demanda aduce hechos constitutivos de causa de acción y dada la conclusión a que llegamos con respecto al resultado de la prueba, *procede en este caso revocar la sen-*

*tencia apelada y dictar este tribunal la que de acuerdo con la ley y los hechos corresponde. Considerando que el deman-·dante al tiempo del accidente era un hombre saludable, pues de la evidencia no aparece lo contrario, que tenía de veinti-cuatro a veinticinco años de edad, que ha quedado total y permanentemente inútil de la pierna derecha, teniendo en cuenta los agudos dolores físicos de que fué víctima, y que ganaba $1.25 diarios, al declarar con lugar la demanda pro-cede condenar a la demandada apelada a pagar al deman-dante apelante la cantidad de $2,500 por concepto de los daños sufridos, antes descritos, más las costas y la cantidad de $350 para honorarios de abogado.*